SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------------------------x
UNITED STATES OF AMERICA,                              24 CR 555 (CS)


-against-


MOUT'Z SOUDANI,

                              Defendant.
------------------------------------------------------------------------x


---

## MEMORANDUM OF LAW

Submitted by Defendant Mout'z Soudani
in Support of Motion Dismiss

---


HODGES WALSH & BURKE, LLP
55 Church Street, Suite 211
White Plains, New York 10601
(914) 385-6000

TABLE OF CONTENTS

PRELIMINARY STATEMENT ……………………………………………………………..1

BACKGROUND ……………………………………………………………………………2

LEGAL STANDARD ……………………………………………………………………….5

ARGUMENT ………………………………………………………………………………..6

I.  SECTION 666 REQUIRES SOLICITING OR ACCEPTING A BENEFIT IN
    EXCHANGE FOR *AGREEING* TO PERFORM AN OFFICIAL ACT ………………………6

II.  THE INDICTMENT DOES NOT SUFFICIENTLY ALLEGE THAT
     SOUDANI INDUCED ROSENWASSER TO AGREE TO ACCEPT A
     BENEFIT OR THAT ROSENWASSER AGREED TO ACCEPT A
     BENEFIT IN EXCHANGE FOR TAKING ACTION ON ANY
     SPECIFIC AND FORMAL EXERCISE OR GOVERNMENTAL POWER ………………11

III.  ABSENT SUFFICIENT FACTUAL ALLEGATIONS THAT SOUDANI
      AND ROSENWASSER HAD A *QUID PRO QUO* AGREEMENT, THE
      CONSPIRACY TO COMMIT HONEST SERVICES AND HONEST
      SERVICES WIRE FRAUD CHARGES MUST ALSO BE DISMISSED …………………15

IV.  ABSENT SUFFICIENT FACTUAL ALLEGATIONS THAT THE
     RECIPIENTS OF SOUDANI'S ALLEGED APRIL 16, 2023
     TEXT MESSAGES WERE UNAWARE OF SOUDANI'S FAILING
     HEALTH, THE INTERSTATE THREAT CHARGE MUST ALSO
     BE DISMISSED ………………………………………………………………………..16

CONCLUSION ……………………………………………………………………………17

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*McDonnell v. United States*, 579 U.S. 550 (2016) ……………………...…………..7, 8, 9, 10

*Russell v. United States*, 369 U.S. 749 (1962) ……………………………………………………5

*Skilling v. United States*, 561 U.S. 358 (2010) …………………………………...…………10, 15

*Snyder v. United States*, 603 U.S. 1 (2024) ……………………………………………...…*passim*

*United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002) ……………………………….…………..9

*United States v. Calk*, 87 F.4th 164 (2d Cir. 2023) ……………………………...………………..6

*United States v. Ganim*¸ 510 F.3d 134 (2d Cir. 2007) ……………………………………………7

*United States v. Gonzalez*, 686 F.3d 122 (2d Cir. 2012) …………………………...…………..5

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) ……………………………….…..8

*United States v. Nicklas*, 713 F.3d 435 (8th Cir. 2013) ……………………………………16

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) ……………………………….…………..9

*United States v. Sutcliffe*, 505 F.3d 944 (9th Cir. 2007) …………………………………………16

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ……………………………….…………..5

<u>STATUTES</u>

18 U.S.C. § 201(b) ……………………………………………...……...…*passim*

18 U.S.C. § 666 …………………………………………………..…………………..*passim*

18 U.S.C. § 875 ……………………………………………...…………………….2, 16

18 U.S.C. § 1343 ………………………………………….……….……………………..2, 6

18 U.S.C. § 1346 ……………………………………………………………………..2, 6

18 U.S.C. § 1349 …………………………………………………………………………..2, 6

Fed. R. Crim. P. 12(b) …………………………………………….…………………………5

New York State Executive Law § 625 …………………………………………..……….14

New York State Executive Law § 641 …………………………………………..………….14

New York State Executive Law § 642 ……………………………………………………..14

New York State Executive Law § 646 …………………………………………….…..14

New York Penal Law § 155.35 ……………………………………………………………5

New York Penal Law § 155.40 ……………………………………………………………4

New York Penal Law § 155.42 ……………………………………………………………4

New York Penal Law § 170.10 ……………………………………………………………4

New York Penal Law § 470.20 ……………………………………………………………4

## PRELIMINARY STATEMENT

The government's case on the face of the instant indictment is deficient. The government's Indictment does not sufficiently allege any of its charges against Mout'z Soudani, and, should therefore be dismissed.

A bribery case requires not simply a *quid* and a *quo,* but most critically, a *pro* - that is, an agreement to exchange one thing for another. In the context of this case, where the government alleges that the "bribe" consisted of personal loan payments made by Mout'z Soudani to Stewart Rosenwasser, the payments must have been made contemporaneously when any agreement was made between the parties. Yet in this case - which the government rushed to bring against Rosenwasser, a former judge and then high-ranking member of the Orange County District Attorney's Office, and Soudani, the victim of the crime that Rosenwasser, in his capacity as a prosecutor, investigated and prosecuted. More specifically, it is alleged that the alleged "bribe" (the *quid*) in this case consists of several personal loan payments, totaling $63,000.00, made by Soudani, a crime victim, made to Rosenwasser, who was not only the prosecutor who investigated and prosecuted the crimes committed against Soudani by Individuals 1 and Individual 2, but who had also represented Sudani as his attorney on several transactional and non-criminal legal matters. *See* Indictment. The official action allegedly procured (the *quo*) was Rosenwasser investigating and criminally prosecuting Individual 1 and Individual 2, who ultimately pleaded guilty plea to third-degree grand larceny in exchange for a sentence promise of an indeterminate term of one to seven years' state prison and paid Soudani $478, 286.42 in restitution *Id*. The alleged *pro* tying these two lawful acts together depends entirely on speculation and innuendo the government tries to draw from the timeline of events set forth in the indictment, text message exchanges between Rosenwasser and Soudani, and correspondence between Rosenwasser and Individual 1 and

Individual 2's attorneys, and alleged verbal communications between Rosenwasser and members of the Orange County District Attorney's Office, which are described in the indictment. *Id*.

Accordingly, the deficiencies in the government's case are clear on the face of the indictment. Accordingly, Soudani is entitled to a dismissal of the instant Indictment.

## **BACKGROUND**

On September 24, 2024, the government unsealed an indictment accusing Mout'z Soudani of making payments to prosecutor Stewart Rosenwasser in exchange for Rosenwasser investigating, arresting, prosecuting Individual 1 and Individual 2. *See* Indictment at ¶ 1. The eight count indictment states five counts that are applicable to Soudani: conspiracy to commit bribery, 18 U.S.C. § 666(a)(1)(B) and § 666(a)(2) (Count I), bribery, 18 U.S.C. §§ 666(a)(2) and (2) (Count III), conspiracy to commit honest services fraud, 18 U.S.C. § 1349 (Count IV), honest services wire fraud, 18 U.S.C. §§ 1343, 1346, and 2, (Count V), and interstate threats, 18 U.S.C. §§ 875(c) and (2) (Count VIII).

The allegations supporting the conspiracy to commit bribery and bribery charges are found at paragraphs 14 to 24, 62 to 66(r), and 69 to 70 of the indictment. Despite the fact that the indictment reproduces quotes from messages, emails, and conversations to support numerous other points, it does not allege any specific exchanges or conversations in which Soudani and Rosenwasser entered into this purported *quid pro quo* agreement. Instead, the existence of an agreement is alleged only in conclusory terms.

While Rosenwasser was an attorney in private practice, he represented Soudani on at least ten separate real estate transactions involving during the period from October 1990 until November 1991, including the filing of 19 different documents. ¶ 39(a). Rosenwasser also represented both Soudani and his son [Individual 3] on a criminal matter involving an alleged burglary. During the

period of time Rosenwasser served as an Orange County Court Judge, Rosenwasser visited Soudani socially. *Id*.

In late October 2022, Rosenwasser, who was then employed as Executive Assistant District Attorney and Chief Counsel to the District Attorney at the Orange County District Attorney's Office, initiated a criminal investigation of Individual 1 and Individual 2 for stealing hundreds of thousands of dollars from Soudani. Individual 1 and Individual 2 are both close relatives of Soudani's who had both also previously resided with him in New York and moved to Colorado in or about mid-October 2022. ¶ 2, 15.

Between October 26, 2022, and November 3, 2022, Rosenwasser and Soudani exchanged multiple phone calls concerning the criminal investigation. On October 28, 2022, Rosenwasser emailed an investigator at the Orange County District Attorney's Office. In his email, Rosenwasser stated that he had been contacted by "Mout'z Soudani (Marty) who advised [Individual 1] and [Individual 2] may have stolen an investment account (1.8 million) and over a half million dollars in cash. He [Soudani] has attempted to contact them [the Individual 1 and Individual 2] without success." On October 31, 2022, the Orange County District Attorney's opened an investigation. ¶ 15.

On or about November 10, 2022, nearly two weeks after Rosenwasser took any official action by initiating the criminal investigation, Soudani loaned Rosenwasser $15,000.00, by check, with "Loan" written in the memo. By May of 2024, Soudani had made several loan payments to Rosenwasser for an aggregate amount of $63,000.00.[1] ¶¶ 2, 18(b), 59.

---

[1] Discovery provided by the government confirms that Rosenwasser had partially repaid the loan to Soudani, that Soudani had previously loaned money to Rosenwasser, that Rosenwasser had repaid those loans, and that in addition to borrowing money from Soudani, Rosenwasser had borrowed money from several other individuals. *See* Notes from Proffer of Counsel for Stewart Rosenwasser Benjamin Allee, Esq., June 27, 2024, USAO_00019302-00019302 [APO] and September 13, 2024, USAO_00019294-00019298 [APO].

On November 18, 2022, during a text message exchange with Soudani, Rosenwasser stated that Individual 2 had become a millionaire "with [Soudani's] money." ¶ 18(c).

On December 23, 2022, during a text message exchange with Soudani, Rosenwasser stated "I'm going to go into grand jury as soon as I receive your certified bank records. I have arranged an audit of all the electronic transfers." ¶ 18(e).

On January 23, 2023, during a text message exchange with Soudani, Rosenwasser stated "I will always protect you and help you." ¶ 21.

On March 8, 2023, by felony complaint, Rosenwasser charged Individual 1 with second-degree grand larceny (New York Penal Law § 155.40(1)), for allegedly stealing $350,000.00 from Soudani and Individual 2 with first-degree grand larceny (New York Penal Law § 155.42)), for stealing $1,620,506.50 from Soudani. Based on the complaint, Rosenwasser obtained arrest warrants for Individual 1 and Individual 2. ¶ 26.

On March 8, 2023, Individual 1 and Individual 2 were arrested in Colorado. ¶ 29. At the time of their arrests, Individual 1 and Individual 2 were residing in an apartment owned by Individual 3. ¶ 30.

Between May 10 and May 12, 2023, Rosenwasser presented evidence to and obtained an Indictment from the grand jury charging Individual 2 with first-degree grand larceny (New York Penal Law § 155.42), money laundering (New York Penal Law § 470.20(1)), and four counts of forgery in the second degree (New York Penal Law § 170.10(1)). ¶ 44.

In June 2023, Rosenwasser was recused from prosecuting Individual 1 and Individual 2. ¶ 47.

In September 2023, the Orange County District Attorney's Office declined to proceed to grand jury with respect to the charges against Individual 1. On September 18, 2023, upon the

motion of the District Attorney's Office, an Orange County Judge: reduced and dismissed the criminal charges against Individual 1 in light of a plea and cooperation agreement between Individual 1 and the Orange County District Attorney's Office. ¶¶ 52, 53.

On November 28, 2023, Individual 2 pleaded guilty, pursuant to a plea agreement with the Orange County District Attorney's Office, to third-degree grand larceny (New York Penal Law § 155.35(I)). ¶ 54.

On January 5, 2024, Soudani received restitution from Individual 2 in connection with the Criminal Case, by check, in the amount of $478,286.42. ¶ 55.

On or about March 6, 2024, Individual 2 was sentenced to an indeterminate sentence of one to seven years' imprisonment. ¶ 58.

## **LEGAL STANDARD**

An indictment must be dismissed pretrial if it fails to allege facts that constitute a prosecutable offense. Fed. R. Crim. P. 12(b)(1), 12(b)(3)(B). The government must therefore allege "the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), and a "deficiency in an indictment's factual allegations" cannot be cured simply by reciting the charged statute, *United States v. Gonzalez,* 686 F.3d 122, 127 (2d Cir. 2012); *see also Russell v. United States,* 369 U.S. 749, 764-65 (1962) ("[A]n indictment must do more than simply repeat the language of the criminal statute--... it must descend to particulars") (citation omitted). That is a constitutional imperative: The Fifth Amendment requires a charging document to contain a sufficient amount of "factual particularity" to prevent prosecutors from "fill[ing] in elements of its case with facts other than those considered by the grand jury." *United States v. Walsh,* 194 F.3d 37, 44 (2d Cir. 1999) (citation omitted). Further, purely legal questions presented in a pretrial

motion must be decided "before trial unless [the court] finds good cause" for deferring its ruling. Fed. R. Crim. P. 12(d).

## <u>ARGUMENT</u>

The Court should dismiss Counts I, III, IV, and V of the indictment, which charges Soudani with conspiracy to commit bribery under 18 U.S.C. §§ 666(a)(1)(B) and 666(a)(2), bribery under 18 U.S.C. §§ 666(a)(2) and (2), conspiracy to commit honest services fraud under 18 U.S.C. § 1349, and honest services wire fraud, 18 U.S.C. §§ 1343, 1346, and 2, because the indictment does not sufficiently allege that Soudani conspired with Rosenwasser such that Rosenwasser agreed to accept benefits in exchange for performing an official act.

## I. SECTION 666 REQUIRES SOLICITING OR ACCEPTING A BENEFIT IN EXCHANGE FOR *AGREEING* TO PERFORM AN OFFICIAL ACT

Section 666(a)(1)(B) penalizes any public official who "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666 (a)(1)(B); *United States v. Calk,* 87 F.4th 164, 179 (2d Cir. 2023) (quotation marks omitted). Four features of the statute are pertinent here.

*First,* the statute prohibits only bribes, not gratuities or, as in this case, personal loans. In *Snyder, supra,* the Supreme Court rejected the Justice Department's view that Section 666 extends to gratuities. 603 U.S. at 9. Although a gratuity may violate state or local ethics rules, it does not violate Section 666. *Id.* As the Supreme Court explained, that interpretation would impermissibly transform Section 666 into "a vague and unfair trap for 19 million state and local officials." *Id.* at 14, 19.

Importantly, gratuities come in two forms: (i) something "given after the fact, as 'thanks' for an act but not in exchange for it," and (ii) something "given with a nonspecific intent to 'curry favor' with the public official to whom it was given." UNITED STATES DEP'T OF JUSTICE, CRIMINAL RESOURCE MANUAL § 2041; *see United States v. Ganim,* 510 F.3d 134, 146 (2d Cir. 2007) (Sotomayor, J., for the Court) (identifying the two types of gratuities and explaining that the latter are lawful even under federal statutes that prohibit some gratuities). After *Snyder,* neither amounts to a violation of the Section 666. *See Snyder,* 603 U.S. at 5 (noting gratuities are "typically" payments made "after an official act as a token of appreciation"); *McDonnell v. United States,* 579 U.S. 550, 579 (2016) (bribery requires agreement on "specific and focused" official act in exchange for payment).

*Second,* bribery requires that the defendant agreed to perform an "official act." Although that term does not appear in the statute, the Supreme Court has construed the statutory language to encompass the ordinary official-act requirement for bribery. In the first sentence of its opinion in *Snyder,* the Supreme Court stated that "Section 666--makes it a crime for state and local officials to 'corruptly' solicit, accept, or agree to accept 'anything of value from any person, intending to be influenced or rewarded' *for an official act*." *Id.* at 5 (quoting 18 U.S.C. § 666(a)(1)(B) (emphasis added). The Court went on to repeat the "official act" requirement twenty-five times in its majority opinion. *See, e.g., id.* at 10 ("Section 666(a)(1)(B) makes it a crime for state and local officials to 'corruptly' accept a payment 'intending to be influenced or rewarded' for an official act."); *id.* ("Section 666 shares the defining characteristics of [18 U.S.C.] § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the official act.").

Indeed, even the three dissenting Justices agreed that the statute requires an official act. As Justice Jackson explained (in agreement with the majority on this point): "There is no dispute that

§ 666 criminalizes bribes. This Court has also been clear about what a bribe requires: '*a quid pro quo*.' A *quid pro quo* means 'a specific intent to give or receive something of value *in exchange for an official act*.'" *Id.* at 23-24 (emphasis added; citations omitted).

Accordingly, although the Second Circuit had previously concluded that the "'official act' standard does not apply to § 666," *United States v. Ng Lap Seng,* 934 F.3d 110, 142 (2d Cir. 2019), that holding is no longer good law in the wake of *Snyder.* The Second Circuit's view rested on the absence of the phrase "official act" from Section 666 and the contrasting presence of that phrase in the federal-official bribery statute, 18 U.S.C. § 201(b). *See id.* at 132-33, 137 n.28. However, *Snyder* has made it clear that the statutory language in Section 666 requires an official-act element. Moreover, in construing Section 666, *Snyder* explained that it "tracks" Section 201(b), noting that "Congress modeled the text of § 666(a)(1)(B) for state and local officials on § 201(b)." 603 U.S. at 10, 19; *see also id.* at 12 ("Section 666 shares the defining characteristics of § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the official act."). *Snyder* thus rejected the Second Circuit's distinction between Section 666 and Section 201(b).

*Third,* as construed in *McDonnell, supra,* the official-act requirement has two components: "The [g]overnment must prove that [i] the public official made a decision or took an action on [ii] a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." 579 U.S. at 567 (quoting 18 U.S.C. § 201(a)(3)).

Under the first requirement, "[s]etting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about [a question or matter] or to gather information" are insufficient for criminal liability. *Id.* at 573. Likewise, "[s]imply expressing support for [a particular course of action] at a meeting, event, or call--does not qualify as a decision or action on

the [question or matter], as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'" *Id.*

Under the second requirement, to qualify as a "question" or "matter," the activity that the official seeks to influence must "involve a formal exercise of government power that is similar in nature to a lawsuit, administrative determination, or hearing" and "must also be something specific and focused." *Id.* at 571, 574. General or high-level goals are insufficient. *See id.* at 578; *see also, e.g., United States v. Alfisi,* 308 F.3d 144, 149 (2d Cir. 2002) ("[B]ribery involves the giving of value to procure a specific official action from a public official"). As the Second Circuit explained in *United States v. Silver,* 948 F.3d 538 (2d Cir. 2020), "at the time the bribe is made, the promised official act must relate to--[a] focused, concrete and specific [ ] question or matter." *Id.* at 556-57. While Second Circuit precedent does not require the defendant to agree to perform "a particular act of influence," the defendant "must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action on a particular question or matter as the opportunity to influence that same question or matter arises." *Id.* at 552-53 (emphasis omitted).

*Fourth,* and relatedly, the government must prove that "the public official agreed to perform an 'official act' *at the time of* the alleged *quid pro quo.*" *McDonnell,* 579 U.S. at 572-73 (emphasis added). As *Silver* put it, "*McDonnell* re-emphasizes that the relevant point in time in a *quid pro quo* bribery scheme is the moment at which the public official accepts the payment." 948 F.3d at 556.

These four requirements rest in part on constitutional concerns. *See McDonnell,* 579 U.S. at 575-77. For example, without a clear definition of what conduct is covered by federal bribery

laws, the threat of criminal sanction would chill speech by state and local officials, who "might wonder whether they could respond to even the most commonplace requests for assistance," and "citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* at 575. To comport with due process, moreover, a bribery offense must be sufficiently definite so "that ordinary people can understand what conduct is prohibited" and prosecutors cannot engage in "arbitrary and discriminatory enforcement"--for example, by prosecuting high-profile political figures for common conduct. *Id.* at 576 (quoting *Skilling v. United States,* 561 U.S. 358, 402-03 (2010)). And reading federal bribery statutes broadly would disrupt our federal system by supplanting state and local policy judgments about what gifts officials can permissibly accept with a draconian federal criminal prohibition. *See Snyder,* 603 U.S. at 16; *McDonnell,* 579 U.S. at 576.

For that reason, even if the contours of an "official act" under Section 666 differed somewhat from the defined term under the Section 201(b), the core requirement would be the same: An official must at minimum have used his or her official position to take action, or to pressure or advise another official to take action, resulting in a specific and formal exercise of governmental power. That is consistent with the text of Section 666(a)(1)(B), which requires that the defendant have demanded or accepted a benefit "in connection with any business, transaction, or series of transactions of [a governmental] organization" that receives federal funds. As all nine Justices agreed in *Snyder,* the language of the statute invokes *quid pro quo* bribery, 603 U.S. 18; *id.* at 23 (Jackson, J., dissenting), and the matters that the statute identifies--"business, transaction, and series of transactions"--are specific and concrete governmental actions, not abstract or general objectives.

Appling Snyder's four factor analysis to the instant case, it is clear that this Court should dismiss the Section 666 conspiracy to commit bribery and bribery charges against Soudani because

the indictment does not sufficiently allege a *quid pro quo* agreement between Soudani and Rosenwasser to take action (or pressure or advise another official to take action) on any specific question or matter involving the formal exercise of governmental power. It alleges that Rosenwasser agreed to investigate and prosecute the individuals and provide information about the investigation to Soudani and also seize money from the individuals, which was ultimately paid back to Soudani as restitution in conclusory terms. ¶¶ 65, 70. However, the Indictment does not allege when the agreement was initial entered into between Soudani and Rosenwasser and

The indictment therefore does not sufficient facts to allege the *sine qua non* of bribery--the solicitation or acceptance of something of value in exchange for an official act.

## II. THE INDICTMENT DOES NOT SUFFICIENTLY ALLEGE THAT SOUDANI INDUCED ROSENWASSER TO AGREE TO ACCEPT A BENEFIT OR THAT ROSENWASSER AGREED TO ACCEPT A BENEFIT IN EXCHANGE FOR TAKING ACTION ON ANY SPECIFIC AND FORMAL EXERCISE OF GOVERNMENTAL POWER.

Federal law does not prohibit state officials from accepting gifts, and certainly loans, from political patrons or friends. To the contrary, a state official violates federal law only if he accepts something of value in exchange for performing or promising to perform an "official act." Here, the government's alleges that Rosenwasser's criminal prosecution of Individual 1 and Individual 2 as described in the Indictment constitute the "official acts" in support of its claim that Soudani bribed prosecutor Rosenwasser. *See* Indictment. However, the government has failed to allege sufficient facts beyond blanket conclusory statements that show that any of the payments made by Soudani to Rosenwasser, which the government maintains were bribes, were made as part of an agreement for an exchange for any kind of "official acts" so as to constitute a violation of 18 U.S.C. §§ 666. The government nevertheless argues that Soudani is criminally liable based on his conduct and interactions with Rosenwasser. However, the "bribery" scheme alleged in the instant

11

indictment that does not meet the definition of bribery and indeed does not amount to a federal crime at all. The Supreme Court rebuked the Justice Department for adopting an "unfathomable" interpretation of the federal-program bribery statute, 18 U.S.C. § 666(a)(1)(B), that "would leave state and local officials entirely at sea to guess about what gifts [or gratuities or personal loans] they are allowed to accept under federal law, with the threat of up to 10 years in federal prison if they happen to guess wrong." *Snyder v. United States,* 603 U.S. 1 (2024). As the Court admonished government prosecutors, "[t]hat is not how federal criminal law works." *Id.*

In an attempt to look for something, anything, to support a federal charge against Soudani, the government has settled on a theory that essentially depends on the Department's longstanding view that Section 666 criminalizes gratuities and loans, including gifts meant to curry favor with governmental officials but not linked to any specific question or matter. When the Supreme Court rejected that interpretation last year, prosecutors simply added a minutia of allegations and called their theory *bribery*--"a far more serious offense than gratuities," *id.* at 7.

The indictment in this case alleges that Rosenwasser, in his capacity as a high-ranking prosecutor with the Orange County District Attorney's Office was induced by the loan payments he received from Soudani to prosecute Individuals 1 and 2. *See* Indictment ¶ 1. However, the government does not have the necessary evidence to allege facts necessary to establish the existence of such an agreement between Soudani and Rosenwasser because no such agreement ever existed. To the extent that Rosenwasser was influenced by Soudani, such influence was the result of longstanding friendship between the two men. Moreover, the fact that Rosenwasser did not receive a loan payment from Soudani until after Rosenwasser commenced his criminal investigation of Individual 1 and Individual 2 belies the government's contention that Rosenwasser was induced by Soudani.

Prior to his tenure as a high-ranking member of the Orange County District Attorney's Office, Rosenwasser was not only an Orange County Court Judge, but also an attorney who was engaged in private practice. In his capacity as an attorney in private practice, Rosenwasser represented Soudani on at least ten separate real estate transactions involving during the period from October 1990 until November 1991, including the filing of 19 different documents. Rosenwasser also represented both Soudani and his son [Individual 3] on a state criminal matter involving an alleged burglary. *See* Indictment at ¶ 39(a). Their relationship started as attorney and client, but over time a friendship developed between the two men. During the period of time Rosenwasser served as an Orange County Court Judge, Rosenwasser visited Soudani socially. *Id*. Accordingly, when Individuals 1 and 2 stole hundreds of thousands dollars from Soudani, thereby committing a crime against him, to the extent that Rosenwasser was influenced by anything in his desire to investigate and prosecute Individuals 1 and 2, it was his existing relationship with Soudani and not by any *quid pro quo* bribery scheme as the government alleges.

Because of his prior representation of Soudani, Rosenwasser's direct involvement in and handling of the investigation, arrest, and criminal prosecution of Individuals 1 and 2, who had committed crimes against Soudani, was, at best, a conflict of interest. His involvement would have absolutely guaranteed disciplinary action being taken against him by the 9th Judicial District Attorney Grievance Committee. Yet, Rosenwasser's conduct, while likely unethical, was not criminal because Rosenwasser was not bribed, and the government does not adequately allege that any payments made to Rosenwasser were contemporaneously made in connection with a *quid pro quo* agreement between Soudani and Rosenwasser, which, pursuant to *Snyder*, is necessary to sustain a bribery prosecution. In fact, the timeline proffered by the government in the Indictment indicates that the first loan payment Soudani made to Rosenwasser was on November 10, 2022,

13

nearly two weeks after Rosenwasser commenced his criminal investigation of Individual 1 and Individual 2. *See* Indictment at ¶¶ 15, 18(b).

Further, that Soudani loaned Rosenwasser money was not unusual; Soudani had previously loaned Rosenwasser monies in the past, which Rosenwasser had always repaid. That Rosenwasser and Soudani corresponded regularly about the prosecution was neither irregular nor improper, Rosenwasser was investigating and prosecuting the criminal case in which Soudani was the victim. It is both a common practice and a legal requirement for a prosecutor to correspond with a crime victim and share information concerning the related criminal prosecution. *See* New York State Executive Law §§ 625-a, 625-b, 641, 641(3), 642, 646, 646(a); *see also* Criminal Procedure Law §§ 380.50(4), (5), 440.50. That Rosenwasser prosecuted a criminal matter in which he had a prior attorney-client relationship with the victim and personally knew both the defendants, Individual 1 and Individual 2, although a likely conflict of interest that warranted his recusal, was not a crime. Ultimately, the government's entire case consists of alleging that Rosenwasser's investigation and prosecution of Individual 1 and Individual 2 was part of a *quid pro quo* agreement whereby he received payments from Soudani to do so. Yet, the government does not specify when and how such an agreement was made, instead, the government relies only on conjecture and innuendo to allege that such an agreement existed. As such, the government's case against Soudani is precisely the kind of prosecutorial overreach that the Supreme Court, and many other courts following its seminal decision in *Snyder v. United States,* 603 U.S. 1 (2024), have warned against and said cannot and should not stand.

Accordingly, the deficiencies in the government's case are clear on the face of the indictment. In this circumstance, the federal rules entitle Soudani to a swift dismissal of all of the Section 666 charges in the Indictment.

**III. ABSENT SUFFICIENT FACTUAL ALLEGATIONS THAT SOUDANI AND ROSENWASSER HAD A *QUID PRO QUO* AGREEMENT, THE CONSPIRACY TO COMMIT HONEST SERVICES AND HONEST SERVICES WIRE FRAUD CHARGES MUST ALSO BE DISMISSED.**

The government contends that because Rosenwasser and Soudani participated in a scheme in which Soudani made bribe payments to Rosenwasser in exchange for Rosenwasser investigating and prosecuting Individual 1 and Individual 2, providing confidential information about the investigation to Soudani, and seizing money that would be paid to Soudani as restitution, and sent and received, and caused others to send and receive, electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme, that Rosenwasser and Soudani were also engaged in a conspiracy to commit honest services fraud and committed honest services wire fraud. *See* Indictment at ¶¶ 72, 73. However, in order for these charges in the government's Indictment to be sustained, they must be predicated on Soudani and Rosenwasser having a *quid pro quo* agreement. *See Skilling v. United States*, 561 U.S. 358, (2010) (The honest services statute covers only bribery and kickback schemes and cannot support criminal prosecutions involving conflicts of interest). As previously indicated, the government does not specify when and how such an agreement was made, instead, the government relies only on conjecture and innuendo to allege that such an agreement existed.

Accordingly, the deficiencies in the government's case are clear on the face of the indictment with respect to these charges as well. As such, in this circumstance, the federal rules entitle Soudani to a swift dismissal of these charges as well.

**IV. ABSENT SUFFICIENT FACTUAL ALLEGATIONS THAT THE RECIPENTS OF SOUDANI'S ALLEGED APRIL 16, 2023, TEXT MESSAGES WERE UNAWARE OF SOUDANI'S FAILING HEALTH, THE INTERSTATE THREAT CHARGE MUST ALSO BE DISMISSED.**

The government contends that because Soudani sent a series of text messages to Individual 3, with messages for Individual 1, on April 16, 2023, that consisted of him expressing his desire to harm Individual 1 and Individual 2, that he engaged in making interstate threats. *See* Indictment at ¶¶ 38, 81. However, contrary to the government's claims, Soudani never communicated a threat to physically harm either Individual 1 or Individual 2, but rather his desire to harm them. Specifically, Soudani stated that "… swear to God I wanna fucking choke you with my own hands you deserve a fucking beating like you never had before" and "…the more you fuck with me, the more I will destroy your son". ¶ 38. A conviction for transmission in interstate commerce of any communication containing threat to injure requires the specific intent to threaten, and only true threats may be prohibited. 18 U.S.C.A. § 875(c). *U.S. v. Sutcliffe*, 505 F.3d 944 (9th Cir. 2007). The statutory prohibition against "transmit[ting] in interstate or foreign commerce any communication containing any threat to injure the person of another" does not require the government to prove a defendant specifically intended his or her statements to be threatening, but rather requires the government to prove a reasonable recipient would have interpreted the defendant's communication as a serious threat to injure. 18 U.S.C.A. § 875(c). *U.S. v. Nicklas*, 713 F.3d 435 (8th Cir. 2013). At the time Soudani sent this text message, he was 74 years old and recovering from a hospitalization following a heart attack. Given Soudani's advanced age and failing physical health at the time these alleged text messages were sent, no recipients of these messages could have reasonably viewed these communications as a serious threat to injure them, especially since the recipients in this case, Individual 1 and Individual 2, were related to of Soudani and were aware of his failing health.

Accordingly, because the interstate threat charge is also insufficiently pled, this charge must also be dismissed.

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss the Indictment.

Dated: White Plains, New York
      July 14, 2025

                                     *Michael K. Burke*
                                     Michael K. Burke, Esq.
                                     Saad Siddiqui, Esq.
                                     Hodges, Walsh & Burke, LLP
                                     *Attorneys for Defendant Soudani*
                                     55 Church Street, Suite 211
                                     White Plains, NY 10601
                                     (914) 385-6000
                                     mburke@hwb-lawfirm.com